IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MARK ANTHONY DINALDO,

       Debtor.

PENNSYLVANIA HIGHER EDUCATION
ASSISTANCE AGENCY,

       Appellant,

v.                  //    CIVIL ACTION NO. 1:05CV9
                              (Judge Keeley)

MARK ANTHONY DINALDO,

       Appellee.

## MEMORANDUM OPINION AND ORDER

Pennsylvania Higher Education Assistance Agency ("PHEAA") has appealed the decision of the United States Bankruptcy Court for the Northern District of West Virginia discharging pro se appellee, Mark Anthony Dinaldo's ("Dinaldo"), obligation to repay it $21,525.12 in student loans.

Because there is no legal basis for the bankruptcy court's decision, this Court **GRANTS** the appellant's appeal and **VACATES** the bankruptcy court's November 4, 2004 "Order Discharging Debt."

### I. FACTUAL BACKGROUND

On March 23, 2001, Dinaldo filed a voluntary petition for Chapter 7 bankruptcy relief. Immediately thereafter, he filed a dischargeability suit against the Pennsylvania Higher Education Assistance Agency and EFS Services Inc. ("PHEAA") and the United States Department of Education ("DOE"), in which he sought to

discharge student loan debts owed to them in the amounts of $21,525.12 and $13,839.98, respectively, because "excepting such debt from discharge under 11 U.S.C. § 523(a)(8) would impose an undue hardship on Dinaldo and his dependants."[1]

PHEAA filed an answer to Dinaldo's complaint on April 9, 2001, arguing that his loan should not be discharged because, inter alia, he could repay the debt at a lower monthly rate and to discharge the debt would obviate Congress' intent "to protect student loan funds (which are essentially public monies) from being discharged."

**A. Stipulated Order**

Of overarching importance to this case is the fact that, during the pendency of Dinaldo's Chapter 7 petition, on June 7, 2002, the parties entered into a stipulation that required Dinaldo to apply for an income sensitive loan through the William D. Ford

[1]Section 523(a)(8) provides that a debtor is not discharged from a debt:

> for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution . . . unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents;

## MEMORANDUM OPINION AND ORDER

Direct Student Loan Program ("Ford Program"), a DOE program that would allow him to consolidate his loans, make a lower monthly payment and have his unpaid balance forgiven at the end of twenty-five years.

The bankruptcy court approved the terms of this stipulation in a July 15, 2002, "Stipulated Order and Judgment," which provided as follows:

> The defendants, [PHEAA], by counsel, and the [DOE], by counsel, and the plaintiff, [Dinaldo], in person and by counsel, have represented to the Court that the undersigned parties have agreed to provide for the compromise of all issues and in compromise of the same the parties stipulate to the following facts:
>
> 1. The plaintiff is indebted to [PHEAA] for receipt of student loan funds with an account balance of $21,525.12, including principal and interest through June 7, 2002;
>
> 2. The plaintiff is indebted to the DOE for the receipt of student loan funds with an account balance of $13,839.88, including principal and interest through June 4, 2002.
>
> 3. In light of the facts disclosed during discovery, the parties believe that the student loan debts owed to [PHEAA] and DOE should not be dischargeable due to the fact that plaintiff would qualify for an income sensitive loan which would allow him to make a payment which he could afford with his income and at the end of twenty-five (25) years the unpaid balance would be forgiven;
>
> 4. The parties further are of the opinion that should plaintiff not qualify for an

         income sensitive loan, then his student loan debt, in light of the discovery, would be dischargeable as a hardship on the plaintiff and his dependants;

5.     The parties accordingly stipulate that counsel for the DOE shall furnish to plaintiff the necessary forms so that plaintiff can apply for an income sensitive loan in the amount of the student loan debts due and owing the DOE and [PHEAA] as of the date of the entry of this Order through the [Ford Program];

6.     Plaintiff will complete such application within two (2) weeks after receipt of said application forms in the office of counsel for plaintiff; and will thereafter use his best efforts to furnish such other information and complete such other forms as may be required by DOE in order to process plaintiff's application;

7.     Should the underwriters of the [Ford Program] request additional information from the plaintiff, he shall within two (2) weeks provide such information to the underwriters of such program;

8.     Upon approval of plaintiff for an income sensitive Direct Student Loan, plaintiff shall sign the necessary promissory notes and then counsel for the parties shall inform the Court that a final judgment can be entered declaring the student loan debts nondischargeable;

9.     <u>Should plaintiff be rejected for an income sensitive student loan through the [Ford Program], counsel for plaintiff shall forward such rejection letter to the Court and serve a copy of the rejection letter upon counsel for [PHEAA] and counsel for DOE. If the reasons for rejection relates to a defect in the application process, plaintiff agrees</u>

<u>to reapply and/or use his best efforts to cure such defect. If the rejection relates to program ineligibility, the Court shall enter a judgment declaring the student loan debts discharged.</u>

To signify their agreement to and acceptance of the foregoing terms and conditions, [PHEAA], by counsel, the DOE, by counsel, the plaintiff, and counsel for the plaintiff have signed the Stipulated Order and Judgment and have tendered it to the Court for entry.

After consideration of the proposed Stipulated Order and Judgment, it is hereby

ORDERED that counsel for the DOE provide counsel for the plaintiff with an application for an income sensitive student loan from the [Ford Program]. It is further

ORDERED that the plaintiff within two (2) weeks complete the application form for the income sensitive Direct Student Loan Program and forward the same to counsel for the DOE or directly to the DOE as instructed by the DOE. It is further

<u>ORDERED that judgment shall be entered pursuant to this Stipulated Order after determination by the [Ford Program] of the plaintiff's qualification for an income sensitive student loan in the amount of the debts due and owing [PHEAA] and the DOE.</u>

(Emphasis added.)

B.  **Application Process**

Following entry of this Order and Judgment a series of misadventures occurred between the parties as Dinaldo attempted to

fulfil his obligation to apply for an income sensitive student loan from the Ford Program.

### 1. Dinaldo's First Application

Pursuant to the Stipulated Order and Judgment, on July 16, 2002, Assistant United States Attorney, Patrick M. Flatley ("Flatley"), forwarded the application for the Ford Program to Dinaldo. Dinaldo completed the forms but, inadvertently, forgot to include his debt to PHEAA on the application.[2]

On November 18, 2003, the bankruptcy court held a pre-trial conference at which Dinaldo learned that his application to the Ford Program had been approved with regard to the consolidation of his debt to the DOE, but not as to the debt owed to PHEAA.

According to Dinaldo, the bankruptcy court and Dinaldo's counsel, Michael G. Clagett ("Clagett"), requested that Flatley ask the DOE to add the PHEAA debt onto the loan; Flatley, however, informed them that more paperwork would need to be prepared and filed.

---

[2] Although it is unclear from the record, it appears that Dinaldo included the total amount of his debts to PHEAA and the DOE on his application but attributed that amount only to the DOE, believing that PHEAA and the DOE were the same entity.

### 2. Dinaldo's Second Application

On November 19, 2003, Flatley sent Dinaldo a "Federal Direct Consolidation Loan Request to Add Loans." Clagett completed the new application and, on November 25, 2002, forwarded it to Steven Thomas ("Thomas"), counsel for PHEAA, to request that he complete the "Education Loan Indebtedness" section "so that there [would be] no question that we have covered all of the loans in this request."

Thomas responded in an e-mail which indicated that "no individual at PHEAA may complete any portion of the application on behalf of Mr. Dinaldo (or any other borrower). . . . During the processing of the loan, Federal Direct will send a certification form directly to PHEAA. PHEAA will then certify a payoff amount for the debt . . ."

Thomas' e-mail did, however, inform Clagett of Dinaldo's principal balance, account number and PHEAA's address.

On November 27, 2002, Clagett mailed Dinaldo the completed application and requested that he sign it and return it to him immediately. Clagett forwarded the application to the DOE on December 4, 2002.

### 3. PHEAA's Loan Verification Certificate

On January 29, 2003, Clagett wrote to Flatley about an increase that had occurred in the payment amount of Dinaldo's

consolidated student loan and to inquire about the status of Dinaldo's application to consolidate the PHEAA loan.

After receiving this letter, Flatley contacted the Direct Loan Servicing Center and, on February 13, 2003, informed Clagett that the Consolidation Department at the DOE had sent Dinaldo a letter on January 20, 2003, to inform him that PHEAA had not returned the loan verification certificate the DOE had provided to it. Flatley stated that "[a]ccording to the Direct Loan Servicing personnel, Mr. Dinaldo never responded to the letter sent to him, and PHEAA has still not provided the verification certificate. Until that information is received, the PHEAA loans cannot be added . . ."

According to PHEAA, Dinaldo had not notified anyone involved in this case about the January 20, 2003 letter.

In response to Flatley's report, on August 11, 2003, PHEAA wrote to him claiming that it had received a Federal Direct Consolidation Loan Verification Certificate ("Loan Certificate") on April 22, 2003, and had completed and submitted it to the DOE on April 23, 2003. As a result of Flatley's discovery, however, they submitted another Loan Certificate on August 7, 2003.

On September 17, 2003, the bankruptcy court held a telephone pre-trial conference; however, because the student loan consolidation had not been completed, the court continued the

matter until January 21, 2004. At the conference, DOE's counsel stated that Dinaldo would once again have to reapply for the income sensitive loan.

### 4. Dinaldo's Third Application

On November 5, 2003, Dinaldo submitted a third application to the Ford Program. Clagett sent copies of the application to counsel for the DOE and PHEAA.

After receiving no correspondence regarding the status of the application, Clagett contacted PHEAA on March 19, 2004 and faxed a copy of Dinaldo's application to it.

PHEAA contacted the Ford Program, which confirmed that the application had been received on November 7, 2003, but had been "cancelled," presumably due to Dinaldo's earlier consolidation attempts. In order for Dinaldo to consolidate, therefore, he would need to file another new application.

The Bankruptcy Court held another telephone pre-trial conference on August 3, 2004, at which Clagett moved to discharge the PHEAA loan in light of the fact that over two years had passed and no consolidated loan had been issued. The bankruptcy court refused the motion and granted PHEAA another chance to consolidate the loans.

5.   **Dinaldo's Fourth Application**

On August 5, 2004, PHEAA assisted Dinaldo in completing an on-line application to the Ford Program. Due to an operational oversight by the DOE, however, the program contacted the wrong student loan agency for loan verification. Thus it was that, on September 29, 2004, Dinaldo received a letter from the DOE which informed him that his application had been canceled because it had not been processed within the forty-five day time limit for the completion of on-line applications.

C.   **Order Discharging Debt**

A few days later, the bankruptcy court held another telephone status conference where it learned that Dinaldo's fourth application to the Ford Program had also been rejected. Its patience apparently at an end, the court entered an order discharging Dinaldo's debt to PHEAA "as provided for [by] the stipulated order on July 15, 2002," on the grounds that Dinaldo had "made his best efforts, but the Defendants have not been able to make a decision. The Debtor is on Social Security disability at this time. The Court would not logically require the Debtor to pay student loans from a Social Security benefit . . ."

According to PHEAA, the parties did not have the opportunity to present any evidence at this status conference regarding whether

an actual determination of Dinaldo's eligibility for consolidation had ever been made by the Ford Program.

D.     **Motion for Reconsideration**

Following the ruling of the bankruptcy court, PHEAA filed a motion for reconsideration, arguing that the court's judgment "was inconsistent with the plain meaning of the Stipulated Judgment and Order [and, moreover, that], the [DOE], by way of affidavit . . . acknowledges the operations error befalling [Dinaldo's] application for administrative relief and represents that the application may be reactivated in order to complete appropriate processing."

On November 30, 2004, the bankruptcy court denied PHEAA's motion, noting that "[t]he case, by the items listed in the discovery, was a probable hardship discharge," citing stipulation numbers 3 and 4 of the "Stipulated Order and Judgment", and stating that:

> It is apparent to the Court that the intent of the stipulation is to allow the debtor to qualify for the income sensitive loan and accordingly the debt would not be discharged, but would remain as a debt for the next 25 years. However, it is the Court's opinion that the effect of the program would net zero dollars to the government (or its collection agency).
>
> This Court was agreeable to allowing the parties to attempt to fit the debtor into the program. However, this agreement was entered into July 15, 2002. Pretrial hearings were held on

September 17, 2003, January 21, 2004, August 3, 2004 and November 3, 2004.

Although these were telephonic hearings, this Court has experienced a tremendous increase in telephonic hearings in the past year or two, which has reduced the time available for discussions of the issues that arise at the conferences. There must be a limit. There have been six telephonic hearings on this case, all to further allow the parties to qualify the debtor for the income sensitive loan.

For the above reasons, the motion to reconsider the order discharging the debt is DENIED and it is SO ORDERED.

This appeal followed.

PHEAA contends that the bankruptcy court's ruling violates its rights pursuant to the parties' stipulation and adopted by the bankruptcy court in its July 15, 2002, Order. Despite the gross mishandling of Dinanldo's application by the PHEAA, and the bankruptcy court's quite understandable frustration over that ineptitude, this Court reluctantly agrees with PHEAA that it is entitled to another opportunity to allow the debtor to qualify for an income sensitive loan.

## II.  LEGAL ANALYSIS

**A.  <u>Standard of Law</u>**

The Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a). A district court reviews a bankruptcy court's findings of fact for clear error; conclusions of law are subject to

de novo review.  Educ. Credit Mgmt. Corp. v. Buchanan, 276 B.R. 744, 749 (W.Va. N.D. 2002).

The issues of dischargeability of a student loan for undue hardship and how to interpret the terms of a stipulated order are questions of law subject to de novo review.  Id.; American Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 512 (4th Cir. 2003) (quoting Kenny v. Quigg, 820 F.2d 665, 670 (4th Cir. 1987))("'The construction of disputed terms of a consent order is an issue of law that is freely reviewable on appeal.'").

"In reviewing the Bankruptcy Court's decision, the Court may only consider evidence presented to the Bankruptcy Court and made part of the record."  Buchanan, 276 B.R. at 749.

B.   **Undue Hardship and Interpretation of Stipulation**

A bankruptcy court cannot discharge a student loan debt without making a finding that the debt would impose an undue hardship on the debtor and his dependants.  11 U.S.C. § 523(a)(8). "The exception of such government-sponsored student loan debts from discharge in bankruptcy was enacted to prevent indebted college or graduate students from filing for bankruptcy immediately upon graduation, thereby absolving themselves of the obligation to repay their student loans."  Ekenasi v. Educ. Res. Inst. (In re Ekenasi), 325 F.3d 541, 545 (4th Cir. 2002).  Generally, the burden is on the

debtor to demonstrate that an undue hardship exists.[3] Buchanan, 276 B.R. at 749.

In this case, the parties have stipulated that the debt owed to PHEAA may be discharged <u>unless</u> Dinaldo qualifies for the income sensitive Ford Program. This stipulation does not require that Dinaldo qualify for the program by a specific date. It only provides that, if the Ford Program finds Dinaldo ineligible for a consolidated loan, "the Court shall enter a judgment declaring the student loan debts discharged."

Should Dinaldo's application be rejected, however, due to "a defect in the application process, plaintiff agrees to reapply and/or use his best efforts to cure such defect."

The bankruptcy court embraced these stipulations in its July 15, 2002 Order, and further ordered that "after determination by

---

[3]To justify a finding of undue hardship, the debtor must show:
1) that he cannot maintain, based on current income and expenses, a 'minimal' standard of living for himself and his dependents if forced to repay the loans;
(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
(3) that he has made good faith efforts to repay the loans.

Buchanan, 276 B.R. at 751 (quoting Brunner v. New York State Higher Education Services Corp., 831 F.2d 395, 396 (2d Cir. 1987).

the [Ford Program] of the plaintiff's *qualification* for an income sensitive student loan in the amount of the debts due and owing" to PHEAA and the DOE, judgment would be entered pursuant to the parties' stipulation.

### C.   Discussion

The bankruptcy court discharged Dinaldo's debt to PHEAA on November 5, 2004, because Dinaldo had "made his best efforts, but the Defendants have not been able to make a decision." This ruling, however, does not comply either with the requirements of the July 15, 2002 Stipulated Order or the requirements of the Code.

#### 1.   The Stipulated Order

As mentioned previously, "under bankruptcy law, the authority to grant the discharge of a student loan debt - whether of the whole debt or only a portion thereof - must be conditioned upon a finding of undue hardship." Buchanan, 276 B.R. at 750; 11 U.S.C. 523(a)(8). PHEAA gave up its legal right to have that matter adjudicated by stipulating that Dinaldo's loan should be discharged *so long as* Dinaldo has been substantively rejected by the Ford Program. No such rejection has issued, however.

In point of fact, the only substantive determination made by the Ford Program resulted in Dinaldo's *approval* for an income sensitive loan to consolidate his debt to the DOE. Accordingly,

the bankruptcy court's decision to discharge the debt because Dinaldo "made his best efforts, but the Defendants have not been able to make a decision," is at odds with its July 14, 2002 Order that "judgment shall be entered pursuant to this Stipulated Order after determination by the [Ford Program] of the plaintiff's *qualification* for an income sensitive student loan in the amount of the debts due and owing [PHEAA] and the DOE."[4]

## 2. Section 105(a)

The argument offered by Dinaldo in support of the bankruptcy court's decision is that a bankruptcy court has broad equitable power to "manage its docket" under 11 U.S.C. § 105(a) (emphasis added):

> The Court may issue any order, process, or judgment that is *necessary or appropriate* to carry out the provision of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent abuse of process.

Whether a bankruptcy court's ruling is "necessary and appropriate" to support the provisions of the Code, enforce court orders or prevent abuse of process "must be considered in relation

---

[4]The bankruptcy court never vacated its Stipulated Order; nor did Dinaldo request that it do so.

to the universal goals" identified with the matters at issue. <u>In re A.H. Robins Co.</u>, 1998 U.S. App. LEXIS 413, *12 (4th Cir. Jan 13, 1998) (unpublished) (finding that "a determination of what constitutes a 'necessary or appropriate' sanction of an attorney under Bankruptcy Code § 105(a) must be considered in relation to the universal goals of sanctioning attorneys--compensation to the injured party, punishment and deterrence"). The bankruptcy court, however, never referred to this provision of the Code when it made its ruling.

Moreover, as Dinaldo concedes, § 105(a) does not give a bankruptcy court unlimited authority to ignore statutory requirements or to alter the substantive rights of parties. <u>See</u> <u>Tenn. Student Assistance Corp. v. Mort</u>, 272 B.R. 181, 184 (W.D. Va. 2002); <u>Buchanan</u>, 276 B.R. at 750 n.3.

> While § 105 has been construed to give "broad authority to modify creditor-debtor relationships," it does not allow the bankruptcy court to ignore express statutory requirements otherwise applicable. Section 523 of the Bankruptcy Code contains a laundry list of debts--including taxes, child support, alimony, and student loans--that are exempted from discharge and the "fresh start" otherwise provided by the bankruptcy process. The courts are not free to disregard these exemptions in individual cases, since they represent clear policy decisions by Congress that certain debts ought not to be discharged, at least without express conditions having been met.

Mort, 272 B.R. at 184; see also Buchanan, 276 B.R. at 750 n.3.

In this case, the bankruptcy court's ruling could not be considered "necessary and appropriate" to carry out the provisions of the Code with regard to the dischargeability of student loans. While it is unfortunate that this matter has been pending for over three years, no one party is at fault. Nor has any party intentionally caused a delay in order to prevent the administration of justice. In fact, the record indicates that the parties involved, Dinaldo, PHEAA and the DOE, however well-intentioned, all bear some responsibility for the confusion regarding Dinaldo's current loan status.

There is also no evidence to suggest that, aside from experiencing frustration and annoyance, Dinaldo would have suffered any financial harm as a result of having to wait for a substantive determination by the Ford Program. Indeed, Dinaldo's obligation to pay PHEAA would have remained stayed for as long as his case remained on the bankruptcy court's docket. 11 U.S.C. § 362(a).

Moreover, the order entered by the bankruptcy court on November 30, 2004 denying PHEAA's motion for reconsideration indicates that its decision to discharge Dinaldo's debt was largely motivated by a lack of time and resources to monitor the case. This Court well appreciates the challenges and demands inherent in

managing a docket as busy as that of the Bankruptcy Court for the Northern District of West Virginia; nevertheless, it cannot be avoided that section 105(a) does not give a bankruptcy court the discretion to make rulings that are "necessary" to lighten its caseload.

Finally, even had the bankruptcy court possessed a necessary and appropriate reason for abandoning its July 15, 2002 Stipulated Order and Judgment and ignoring the settlement agreement reached by the parties, it still would have been required to hold a hearing and make a finding of "undue hardship" without regard to the parties' stipulation. Thus, the court's finding in its November 30, 2004 Order that "the case, by the items listed in the discovery, was a probable hardship discharge" was insufficient as a matter of law.

Accordingly, this Court must vacate the bankruptcy court's November 5, 2004 ruling. To hold otherwise would impair the rights of PHEAA pursuant to the Stipulated Order and Judgment and would fail to comply with the provisions of the Code.

### III. CONCLUSION

Because Dinaldo's student loan obligation should not have been discharged, this Court **GRANTS** PHEAA's appeal, **VACATES** the bankruptcy court's November 5, 2004, Order and **REMANDS** this matter

## ORDER

to the Bankruptcy Court for the Northern District of West Virginia for further proceedings consistent with this Order.

The Clerk is directed to transmit copies of this Order to counsel of record.

DATED: August __22__, 2005.

*[signature]*
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE